Filed 2/27/25; Certified for Publication 3/19/25 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re L.W., a Person Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY,<br>    Plaintiff and Respondent,<br>v.<br><br>L.W.,<br>    Defendant and Appellant. | A170656<br><br>(Alameda County Super. Ct. No. JD-036423-01) |

L.W. (mother) appeals from the juvenile court's jurisdiction and disposition rulings in a juvenile dependency case. In late June 2023, the Alameda County Social Services Agency (Agency) removed her then eight-year-old daughter (L.)[1] from her care when mother was hospitalized due to a mental health crisis. Mother contends the juvenile court erred in concluding that it had dependency jurisdiction under Welfare and Institutions Code section 300, subdivisions (b)(1) and (g)[2], and we agree. We therefore reverse.

---

[1] Mother and daughter have the same initials, L.W., so we refer to the daughter as "L." to avoid confusion.

[2] Undesignated statutory references are to the Welfare and Institutions Code.

1

## BACKGROUND[3]

### A.

Until about a week before she was taken into custody, L. had been living with mother, her stepfather (Seth), her maternal grandmother (grandmother), and her four siblings. Her younger sister, Q., was five years old at the time. Grandmother had legal custody of L.'s teenaged siblings: her brother J.W. (Jamal), and her sisters, Jz. W. (Jz.), and Jm. W. (Jm.). Grandmother had adopted the older siblings in 2010 after mother, who was struggling with substance abuse at the time, relinquished her parental rights.

After the family was told they had too many people for their two-bedroom home, they moved out to avoid an eviction. While they searched for housing, mother, grandmother, L., and L.'s two older sisters went to a homeless shelter, where they had been residing for a week before mother's crisis. Seth, Jamal, and Q. moved to Seth's brother's apartment.

Shortly before L. was removed, mother, grandmother, L., Jz., and Jm. went to visit the rest of their family at Seth's brother's home. Mother left to get food and did not return; no one in the family knew where she was. Jz. reported that mother had been crying about the family's difficult circumstances. Believing they were required to arrive at the shelter before curfew, grandmother, L., Jz., and Jm. returned to the shelter without mother. Because L. had no legal guardian at the shelter, the shelter called the police, who took her into protective custody. There were no signs L. had been injured, neglected, or abused, and she reported that she "feels safe with her mother and is not

---

[3] Mother's October 18, 2024 request for judicial notice of her Notice of Appeal is denied as unnecessary.

afraid of her." Grandmother was at the shelter when L. was taken into custody.

When the police contacted Seth and informed him that mother had not returned to the shelter, Seth went to the shelter to retrieve L. However, the authorities declined to release L. to him because he was not her biological parent and did not have his marriage certificate with him.

Approximately eight days later, mother contacted the Agency and reported that she had suffered a mental health breakdown and had been hospitalized as a result. Mother had bipolar disorder and schizophrenia. She had been prescribed the same psychiatric medications since 2012, and she had been taking them until two or three months before her breakdown. Mother had stopped taking her medication because her primary care doctor, who had been issuing her refill prescriptions, said she had to see a psychiatrist to obtain another refill, and she was on a waiting list for a psychiatrist.

Since being released from the hospital, mother resided with Seth and L.'s other's siblings at Seth's sister's home, where there was room for L.

In addition, mother continued to seek treatment for her mental illness. She initially participated in a residential program at Hope House, for women recovering from mental illness and substance abuse. However, mother left Hope House after completing two months of the three-month program. She began seeing a psychiatrist and a therapist, obtained the psychiatric medications she had been prescribed, and resumed taking her medication.

In addition, mother began taking an injectable medication prescribed by her primary care clinic to help address substance abuse. According to mother, she had not had a substance abuse problem in over 10 years, and grandmother confirmed that she

did not believe mother was abusing substances at the time of the dependency proceedings.

## B.

The Agency's operative dependency petition alleged two bases for jurisdiction as to mother, both of which the juvenile court sustained. The first was that mother's mental health or substance abuse issues prevented her from providing safe or adequate care for L. (*See* § 300, subd. (b)(1).) The second was that mother left L. alone, without a safe and adequate adult caregiver, and she could not be located. (*See* § 300, subd. (g).) The Agency bore the burden of proving these jurisdictional grounds by a preponderance of the evidence, based on the circumstances existing at the time of the jurisdictional hearing. (§ 355, subd. (a); *In re S.D.* (2002) 99 Cal.App.4th 1068, 1078 (*S.D.*); *In re Rocco M.* (1991) 1 Cal.App.4th 814, 824 (*Rocco M.*), abrogated on other grounds by *In re R.T.* (2017) 3 Cal.5th 622, 628-630.)

During a combined jurisdiction and disposition hearing in April 2024, the juvenile court found that "mother clearly had a mental health break that brought this case to the [c]ourt's attention" and neither the homeless shelter nor the police found it appropriate to release L. to grandmother or to Seth, and mother had "nothing [else] in place" in terms of back-up care for L. Noting that mother did not complete the Hope House program, the court reasoned that although mother's testimony indicated she was "trying to engage in more consistent services specifically for mental health now," there was not "any real documentation to that effect." As a result, "mother, at least on this record, has not shown the Court that she's been able to treat both the substance abuse issues as well as the mental health issues to get her to a point where she could receive her child back in her care."

4

After ruling that L. was a child described in section 300, subdivisions (b)(1) and (g), the court found that L. could not be safely returned to mother's home. The court ordered that L. instead be placed in the home of her biological father, D.R., a non-offending parent, and terminated dependency jurisdiction.[4]

## DISCUSSION

Mother asserts that substantial evidence does not support the juvenile court's jurisdictional findings under section 300, subdivisions (b)(1) and (g). We agree.

### A.

We begin with section 300, subdivision (g) because the facts underlying the allegation are relevant to both jurisdictional grounds. In support of jurisdiction under section 300, subdivision (g), the petition alleged that: "[o]n or around June 27, 2023, the mother left the minor . . . alone at a shelter and without adult supervision; she could not be located. The minor . . . has been left without a safe and adequate caregiver, who is able to meet her needs."

Based on our review of the record, there was no evidence to support the court's exercise of jurisdiction on this ground. Indeed, the Agency does not even defend the juvenile court's jurisdictional ruling based on section 300, subdivision (g).

Section 300, subdivision (g), provides for dependency jurisdiction where, as relevant here, "a relative or other adult custodian with whom the child resides or has been left is unwilling or unable to provide care or support for the child, the

---

[4] In an earlier order not at issue in this appeal, the juvenile court denied Seth's request to be recognized as L.'s presumed father. We remanded for the juvenile court to re-determine whether it would be detrimental to L. if Seth is not recognized as a third parent. (*See In re L.W.* (Oct. 25, 2024, A169909, A170292) [nonpub. opn.]; Fam. Code, § 7612, subd. (c).)

whereabouts of the parent are unknown, and reasonable efforts to locate the parent have been unsuccessful." This provision requires the Agency to prove that the caregiver with whom the child has been left is unsuitable *and* that the parent cannot be located. (*S.D., supra,* 99 Cal.App.4th at p. 1079; *see also Maggie S. v. Superior Court* (2013) 220 Cal.App.4th 662, 673 (*Maggie S.*).)

First, the record contains no evidence that mother left L. "alone at a shelter and without adult supervision." It is undisputed that L. was at the shelter with her grandmother. Grandmother was willing and available to take care of L., as the Agency's detention report documented. The court repeatedly expressed confusion about why L. was not released to grandmother, stating: "both the police officers and the shelter . . . did not se[e] fit to leave L[.] with the grandmother for some reason. That is nagging at me as to why."

The court made no finding that grandmother was an unsafe or inadequate caregiver. Nor does the Agency attempt to defend such a position on appeal. L.'s older sisters were released to grandmother. As the Agency's detention report indicated, "L[.] reported that she feels safe with the . . . grandmother," as did L.'s older sisters.

L.'s stepfather, Seth, was another potential caregiver for L. Seth went to the shelter to retrieve her when the police called him, but the police declined to release her to him. Seth had resided with and shared parenting responsibilities for L. from the time she was 11 months old. (*See In re L.W., supra,* A169909, A170292.) L.'s younger sister, Q., remained with Seth throughout the dependency proceedings.

Second, the pertinent question at the jurisdictional hearing was whether the section 300, subdivision (g) criteria were met based on the facts in existence *at the time of the hearing.* (*See In re Christopher M.* (2014) 228 Cal.App.4th 1310, 1320

6

(*Christopher M.*); *see also In re R.M.* (2024) 99 Cal.App.5th 240, 247 (*R.M.*).) The juvenile court here focused instead on the facts as they pertained to the section 300, subdivision (g), allegation at the time of L.'s initial detention. The court's failure to analyze the applicability of section 300, subdivision (g), based on the facts at the time of the hearing was legal error. (*See Christopher M.*, at p. 1320.)

By the time of the jurisdictional hearing, mother's whereabouts were no longer unknown, and there was no evidence that, assuming mother herself was unable to safely care for L., she could not arrange for grandmother or Seth to provide appropriate care for L. (*Cf. Christopher M.*, *supra*, 228 Cal.App.4th at p. 1320 [rejecting section 300, subdivision (g) as a basis for jurisdiction once the father had been released from prison because, "[e]ven if the juvenile court found giving custody of [the child] to father was not in [the child's] best interest, there was no evidence that father could not make other arrangements for [the child's] care, including" with the child's paternal grandmother who had an established relationship with the child]; *see also R.M.*, *supra,* 99 Cal.App.5th at pp. 249-251; *In re M.R.* (2017) 7 Cal.App.5th 886, 897.)

In addition, to the extent the Agency was concerned that grandmother or Seth were unsuitable caregivers, it did not support that concern with evidence. In particular, in connection with its arguments concerning jurisdiction under section 300, subdivision (b)(1), the Agency's brief asserts that "[m]other and [Seth] claimed they had stable housing . . . but did not provide that information to the Agency until trial." As a result, the Agency contends, at the time of the hearing, "the Agency and the juvenile court did not have sufficient information about where [L.] would live to assess whether it was safe for [L.]" to return to mother and Seth's home.

Yet the Agency's own jurisdiction report, dated July 2023, confirms that mother had provided her address to the Agency the same month she was released from the hospital. The Agency also listed the same address for Seth in a report as well as in other documents it filed with the court as early as November 2023, making clear that the Agency was well aware of Seth's home address months before the jurisdictional hearing. In any event, it was the Agency's burden to prove L. was left without a safe and adequate caregiver. (*See Maggie S.*, *supra*, 220 Cal.App.4th at p. 673.) The absence of evidence concerning the safety of Seth and mother's home—due to the Agency's failure to do a home assessment—does not suffice.

**B.**

The petition's remaining allegation, which the juvenile court sustained, was that mother suffers from untreated mental health or substance abuse issues that preclude her from safely and adequately caring for L. The Agency contends that the record contains substantial evidence that mother's failure to treat her mental health needs placed L. at substantial risk of future harm. We conclude otherwise.

As relevant here, section 300, subdivision (b)(1), authorizes dependency jurisdiction where "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of . . . [¶] . . . [¶] . . . [t]he inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse." (§ 300, subd. (b)(1)(D).) Jurisdiction under section 300, subdivision (b), requires proof of (1) the specified parental condition or conduct (2) that has caused (3) "serious physical harm or illness" or a "substantial risk" of such harm or illness. (§ 300, subd. (b)(1); *In re A.G.* (2013) 220 Cal.App.4th 675, 683 (*A.G.*); *see also In re N.R.* (2023) 15 Cal.5th 520, 558 (*N.R.*).)

The fact that a parent has a mental illness, without more, is insufficient to support jurisdiction. (*See N.R.*, *supra*, 15 Cal.5th at p. 558; *In re B.H.* (2024) 103 Cal.App.5th 469, 485 (*B.H.*); *In re A.L.* (2017) 18 Cal.App.5th 1044, 1049-1050 (*A.L.*); *A.G.*, *supra*, 220 Cal.App.4th at p. 685; *In re Matthew S.* (1996) 41 Cal.App.4th 1311, 1318 (*Matthew S.*).) As our Supreme Court recently emphasized, "courts have routinely rejected the equation of mental illness with a significant risk of serious harm." (*N.R.*, at p. 558.) The specific harm or substantial risk of harm resulting from the parent's mental illness is a "separate element[]" that must be proven by the Agency. (*Ibid.*; *see also Matthew S.*, at p. 1318.)

Applying these standards here, there's no dispute that mother has been diagnosed with mental illness, but what's lacking is evidence that her mental illness precludes her from safely caring for L. or that her illness otherwise places L. at substantial risk of serious physical harm or illness. We first address evidence concerning mother's mental health before turning to the question of risk to L.

**1.**

The record indicates that, although mother had been diagnosed with schizophrenia and bipolar disorder, by the time of the jurisdictional ruling, she was treating her mental illness with medication, psychiatric care, and therapy.

Shortly after she was released from the hospital, mother enrolled herself in a three-month residential mental health and sobriety program at Hope House. Mother did not complete the program,[5] but by the time of the court's jurisdictional ruling,

---

[5] Mother testified that she left Hope House after completing two out of the three phases of the program because she had to find housing and employment and take steps to get L. back given the dependency case. Hope House required mother to

9

mother's mental health condition was "stable." She was prescribed three medications to address her mental illness, and she testified that she had been taking her medications since she was released from the hospital in July 2023. Seth likewise testified that mother was medication-compliant.

Further, by the time of the juvenile court's ruling, mother had been under the care of a psychiatrist, Dr. Jason Bromley, for about eight months. When the caseworker spoke to Dr. Bromley, he confirmed that he sees mother about once a month and stated that she "reports taking the medications he prescribed." Although he noted there was some " 'chaos' " in her life, he asserted that mother "appears to have stable mental health and does not have any psychotic features at this time based on her presence during conversations with him at her appointments." Mother had last met with Dr. Bromley in March 2024, the same month she testified.

In addition to receiving psychiatric care, mother was seeing a therapist twice a month. She spoke with her therapist about her mental health as well as about the dependency proceedings.

Thus, the only affirmative evidence in the record as to mother's mental health was that, by the time of the jurisdictional ruling, mother was receiving regular treatment for her mental illness through medication as well as care from both a psychiatrist and a therapist.[6]

_____

attend life skills classes from 8:00 a.m. to 4:00 p.m. Mondays through Fridays. In addition, mother was not allowed to have a phone at Hope House, and the program frequently did not inform her of messages left on her phone.

[6] The juvenile court found two aspects of mother's testimony lacked credibility, but the court did not make any general adverse credibility findings against mother. First, the court found not credible mother's assertion that the hospital did not give her medication upon her release. Second, the court

10

The Agency contends that it was reasonable for the juvenile court to conclude that mother was "unlikely" to consistently comply with a treatment regimen without court supervision and that it was not "clear that [m]other was adequately addressing her mental health needs." But the Agency does not argue that the record supports a conclusion that mother's mental health was unstable, nor does it point to any evidence that mother was failing to consistently take her psychiatric medication or see her mental health providers.

Although the Agency does not attempt to defend the juvenile court's ruling on the ground that mother placed L. at risk of physical harm or illness due to an active drug addiction, in arguing that mother's mental illness placed L. at risk, the Agency does rely on mother's inconsistent efforts to receive substance abuse treatment to some extent, as did the juvenile court. The Agency argues that mother "could not consistently explain why she entered a dual-diagnosis" program for people recovering not only from mental illness but from substance abuse. And the Agency contends that mother was receiving monthly maintenance injections intended to address heroin and cocaine abuse, and that she missed some of her injection appointments. The record, however, does not support a conclusion that mother was abusing substances during the dependency proceedings.

Mother testified that, when she entered Hope House, she was not actively abusing any substances. She chose Hope House because it was a "highly recommended" program for women recovering from mental illness. She also testified that she told Hope House that she had a substance abuse issue years ago and

---

concluded that mother's reasons for leaving Hope House were not credible. Neither of the credibility concerns undercut mother's statements that she was medication-compliant and receiving treatment for mental illness, facts which were corroborated by Dr. Bromley's statements.

11

they determined that she fit the criteria for the program. At the time of the hearing, it had been over a decade since mother last had a substance abuse problem. Grandmother likewise reported to the Agency that she did not believe mother was doing drugs.

As the Agency notes, mother's primary care clinic prescribed her a monthly injectable medication intended to help the recipient lose a taste for drugs, including heroin and cocaine. Mother could not recall how often she received injections, but the last time she could recall receiving one was in December 2023. The Agency argues that the fact that mother missed some injections supported a conclusion that her engagement with mental health services was "sporadic." But there is no evidence in the record that the injections were intended to treat mother's mental illness.

Further, although mother continued to seek treatment to support her sobriety, there was no substantial evidence that she was using drugs. (*See People v. Beaty* (2010) 181 Cal.App.4th 644, 657 [taking judicial notice that "recovery from addiction is a lifelong process"].) Mother was receiving injectable medication related to substance abuse treatment, but the Agency points to no evidence in the record explaining whether the medication is prescribed for individuals who have already recovered from an active addiction and seek to maintain sobriety or, instead, for individuals in the process of withdrawing from an active addiction, or both.

In sum, substantial evidence does not support a conclusion that mother was suffering from untreated mental illness or drug addiction.

**2.**

Nor was there substantial evidence that mother's mental illness put L. at substantial risk of physical harm or illness.

12

Even though evidence of harm or risk of harm is a "separate element[]" necessary for jurisdiction under section 300, subdivision (b) (*N.R.*, *supra*, 15 Cal.5th at p. 558), the juvenile court did not expressly address the risk of harm to L. based on mother's mental illness or purported substance abuse. To the extent the court assumed a risk of harm to L. based on mother's mental illness or purported substance abuse, the court committed an error of law. (*See ibid.*)

The Agency rightly does not contend that mother's mental illness has harmed L. in the past. To the contrary, although mother has suffered from mental illness since at least 2012, there is no evidence that her conditions have ever caused physical harm or illness in L. When L. was detained, she reported that the day of mother's breakdown was "the first time [her] mother . . . [had left] for this long." Significantly, L. "reported that she feels safe with her mother and is not afraid of her." Similarly, Jm. stated that "she is not afraid of" mother, and Jz. reported that "she feels safe with her family." The Agency found no signs that L. had been neglected or abused, and she was dressed in clean, appropriate clothing. An Agency report also indicated that L. "excels in school" and that she "screamed[] 'mommy!' " when she arrived to see her mother during a visit. In addition, L.'s younger sister, Q., has been in mother and Seth's care throughout L.'s dependency proceedings.

The Agency argues that, because mother's failure to consistently treat her illness in the past has "already" placed L. in substantial risk of physical harm, the juvenile court could infer that mother's inconsistency in treating her illness would place L. at substantial risk of harm in the future. As we have already held, however, the record disproves the petition's allegation that mother left L. "alone" and "without adult supervision."; L. simply

13

was not at any risk of physical harm or illness, let alone a substantial one, at the time she was detained.[7]

Mother relies on *A.L.*, which held on closely analogous facts that substantial evidence did not support a finding that the parent's mental illness placed the children at risk of physical harm. (*A.L.*, *supra*, 18 Cal.App.5th at p. 1051.) The mother in *A.L.*, who had schizophrenia, had a manic episode after she stopped taking her medication. (*Id.*, at pp. 1046, 1051.) During the episode, she yelled that people were trying to poison her, started throwing things, and threw a shoe that hit her younger child. (*Id.*, at p. 1046.) Her teenaged son had to physically restrain her while the father called the police for assistance. (*Ibid.*) The mother was involuntarily admitted to a hospital, where she remained for 12 days. (*Ibid.*) After leaving the hospital, the mother resumed her medication. (*Id.*, at p. 1051.)

In concluding that the record contained insufficient evidence that mother's mental illness placed the children at risk of physical harm, the court reasoned that the children had suffered no physical harm as a result of the mother's illness: no one was injured during the mother's manic episode, there was no evidence either child was abused, and the children were well cared for despite their mother's illness. (*A.L.*, *supra*, 18 Cal.App.5th at pp. 1049-1051.) Further, this was the first time the family needed assistance from law enforcement even though mother had had schizophrenia for some time. (*Id.*, at p. 1051.) In addition, the mother was hospitalized until her condition stabilized and began taking her medication again after she was released. (*Ibid.*)

---

[7] Notably, although L. was in a homeless shelter at the time she was removed, jurisdiction under section 300, subdivision (b), may not be based solely on "[h]omelessness or the lack of an emergency shelter for the family." (§ 300, subd. (b)(2)(A).)

14

Similarly here, the record reflects that mother had lived with mental illness for years but had never before left for such an extended period; L. received appropriate care despite mother's illness; and mother's mental health had stabilized and she was taking her medication again by the time of the jurisdictional ruling. (*See also, e.g., Matthew S., supra,* 41 Cal.App.4th at p. 1319 [holding that despite the mother's violent delusions concerning her son, there was no evidence of risk of harm to her children where they were healthy and well-groomed, there were no signs of neglect, and mother had participated in extensive therapy]).

The juvenile court reasoned that, although mother was engaging in some services, "it is not sufficient enough for the Court to feel like the mental health piece has resolved." Further, the court stated that, although mother seemed to be "trying to engage in more consistent services specifically for mental health now. . . .[,] I don't know that we have any real documentation to that effect either." It was not mother's burden to prove that her mental health issues had resolved, however. It was the Agency's burden to prove, not only that mother had untreated mental health concerns, but that those concerns prevented her from safely and adequately parenting L. (*See Matthew S., supra,* 41 Cal.App.4th at p. 1318.) The juvenile court erred in relying on a lack of evidence in the record to conclude that it had jurisdiction under section 300, subdivision (b)(1).

In short, substantial evidence does not support the juvenile court's exercise of jurisdiction under section 300, subdivision (b)(1). In light of our jurisdictional ruling, we need not reach mother's remaining arguments.

## DISPOSITION

The juvenile court's April 22, 2024, jurisdictional order is reversed, and the disposition order and all subsequent orders are vacated as moot.

                                                                          BURNS, J.

WE CONCUR:


JACKSON, P. J.
CHOU, J.

*In re L.W. / Alameda County Social Services Agency v. L.W. (A170656)*

16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re L.W., a Person Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY, <br>     Plaintiff and Respondent, <br> v. <br><br> L.W., <br>     Defendant and Appellant. | A170656 <br><br> (Alameda County Super. Ct. No. JD-036423-01) <br><br> **ORDER CERTIFYING OPINION FOR PUBLICATION** |

**THE COURT:**

The opinion in the above-entitled matter, filed on February 27, 2025, was not certified for publication in the Official Reports. On March 19, 2025, a request for publication was received from appellant pursuant to California Rules of Court, rule 8.1120(a). We accepted the request for publication for filing.

For good cause appearing, this court grants the publication request and orders the opinion certified for publication pursuant to California Rules of Court, rule 8.1105(b), (c).

1

BURNS, J.

WE CONCUR:


JACKSON, P.J.
CHOU, J.

*In re L.W. / Alameda County Social Services Agency v. L.W. (A170656)*

2

Superior Court of Alameda County, The Hon. Ursula Jones.

Katherine Marie Curtis, under appointment by the First District Appellate Project, for Defendant and Appellant.

Donna R. Ziegler, County Counsel, and Samantha N. Stonework-Hand, Assistant County Counsel, for Plaintiff and Respondent.